UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 1:26-mj-00094-MJD |
| | ) | |
| OCTAVIO ANDRADE-AGUILERA | ) | |

**MEMORANDUM AND ORDER**

This matter comes before the Court on the United States of America's (the "Government")

Motion for Detention Pending Trial & Response in Opposition to Defendant's Motion for Release

[Doc. 8]. The Government "asks the Court to hold a detention hearing under 18 U.S.C. §

3142(f)(2)(A), and, following that hearing, order the defendant detained pending trial." [Doc. 8 at

Page ID # 13]. Defendant contends that the Government is not entitled to a detention hearing under

these circumstances, as set forth in his written response to the Government's motion [Doc. 11].

The Court heard oral argument regarding the Parties' respective positions on March 27, 2026 (the

"Hearing") and tentatively set a detention hearing, if necessary, for April 3, 2026. For the reasons

set forth herein, the Court respectfully **DENIES** the Government's motion.

I.     **FACTUAL AND PROCEDURAL BACKGROUND[1]**

On March 26, 2026, the Government presented a Criminal Complaint (the "Complaint")

charging Defendant with violating 8 U.S.C. § 1326(a) [Doc. 1]. The Affidavit in Support of the

Complaint provides, *inter alia*, the following facts:

- Defendant is a citizen and national of Mexico and not a citizen or national
  of the United States;

---

[1] The Court gleans the information in this section solely from the following sources: (1) the Complaint and Affidavit in Support [Doc. 1]; (2) the Amended Pretrial Services Report; (3) the parties' respective proffers at the Hearing; and (4) the parties' respective briefs [Doc. 8; Doc. 11].

- Defendant was previously removed from the United States in 2003, 2011, and 2014;

- On August 6, 2015, Defendant was again removed from the United States following a conviction in the Western District of Texas for violating 8 U.S.C. § 1326; and

- There is no evidence that Defendant has sought or received permission from the Secretary of Homeland Security to reenter the United States following his prior removal.

[Doc. 1 at Page ID # 2–4]. The Court issued a warrant for Defendant's arrest [Doc. 12].

At Defendant's initial appearance, the Government made an oral motion to detain Defendant pending trial under 18 U.S.C. § 3142(f)(2)(A). Defendant's counsel argued the case was not eligible for a detention hearing because Defendant was not a serious risk of flight under § 3142(f)(2)(A). The Court requested the parties provide—by email or otherwise—authorities supporting their respective positions and appear for oral argument on March 27, 2026 [Doc. 7]. Defendant's counsel submitted an email referencing several cases later that afternoon.[2] The next morning, the Government filed a written motion setting forth the Government's position and addressing the authorities Defendant's counsel cited in the previous day's email [Doc. 8].

The parties appeared for oral argument on March 27, 2026. AUSA Swafford and Defender Hoagland each did an excellent job presenting their positions and were well-prepared to address the Court's questions. The parties also discussed with the Court an Amended Pretrial Services Report ("PTSR") disclosing Defendant's criminal history from 1997–2026. With the exception of charges in Texas stemming from Defendant's efforts to reenter the United States, all of the charged offenses identified in the PTSR appear to have originated in and around the Northern District of Georgia and the Eastern District of Tennessee.

---

[2] Defendant's counsel sent the email to the Court and the AUSA on March 26, 2026, at 3:51 p.m.

The PTSR contains an excerpt from an Affidavit of Complaint associated with Defendant's most recent charges in state court. On March 8, 2026, law enforcement stopped Defendant for a traffic violation and asked for a license and registration. Defendant could not provide either document. The officer "observed that the female passenger was high[]" and "observed a cut straw in the center console that had a burnt end[]" which "was immediately recognizable as drug paraphernalia." When the officer asked Defendant to provide his name and date of birth, the "driver lied, giving a false name that I read back to him and visually let him review what I had written down on my notepad." The officer then conducted a search of the vehicle and discovered Defendant's Mexican passport and "multiple items of drug paraphernalia."[3] Defendant was charged with several offenses, including criminal impersonation and possession of drug paraphernalia. Defendant pleaded guilty to the possession charge, but all other charges—including the criminal impersonation charge—were dismissed. Prior to this, Defendant's last criminal charge was for illegal re-entry in 2014.

During the Hearing, Defendant's counsel advised the Court that Defendant had numerous ties to his local community. Specifically, Defendant's counsel provided Defendant's residential address and proffered that Defendant has resided in the Northern District of Georgia for several years, which is consistent with the information in the PTSR. Defendant lives at home with his wife (who is a United States citizen) and their daughter (who is also a United States citizen). Approximately two years ago, their daughter suffered an injury that left her in what Defendant's

---

[3] Although the referenced affidavit reflects that the *passenger* was high, there is no indication that Defendant was under the influence while driving the vehicle. Further, the excerpted portion of the affidavit does not identify Defendant as the owner of the vehicle or describe with any specificity the "multiple items of drug paraphernalia" discovered during the search of the vehicle.

counsel characterized as a permanently vegetative state.[4] Defendant's wife is their daughter's sole caregiver, and Defendant is the sole earner for the household. To that end, Defendant has maintained stable employment with a company owned by his family installing siding on homes, and Defendant's counsel represented during the Hearing that the company confirmed Defendant could return to work upon release.

At the conclusion of the Hearing, the Court took the matter under advisement but allowed Defendant an opportunity to respond to the Government's written motion on or before March 30, 2026. The Court also tentatively set a detention hearing for April 3, 2026. Defendant timely filed his written response to the Government's motion [Doc. 11]. The matter is therefore ripe for the Court's consideration.

## II.    ANALYSIS

This order addresses only the threshold question of whether the circumstances of this case warrant a detention hearing. Specifically, the Court focuses solely on whether the Government has carried its burden of proving, by a preponderance of the evidence, that this case involves a "serious risk of flight." *See United States v. White*, No. 3:21-mj-04070, 2021 WL 2155441, at *6–7 (M.D. Tenn. May 27, 2021). The Court begins its analysis with the language of the Bail Reform Act itself.

### A.    The Bail Reform Act

The statutory framework of the Bail Reform Act requires the Court to "explicitly answer[] the question of whether the Government is even entitled to a detention hearing in the first place." *White*, 2021 WL 2155441, at *3. Said otherwise, "[t]he Court is authorized to conduct a detention hearing (*i.e.*, to consider whether to detain Defendant) only if the Government first establishes that

---

[4] Specifically, "his daughter is quadriplegic, has a tracheostomy, is unable to move her body, and receives all of her nutrition via a feeding tube." [Doc. 11 at Page ID # 26]. Defendant's counsel provided supporting medical records during the Hearing.

one of the circumstances listed in Title 18, United Sates Code, Section 3142(f) exists." *United States v. Mendoza-Balleza*, 420 F. Supp. 3d 716, 716 (E.D. Tenn. 2019); *see also White*, 2021 WL 2155441, at *5 (". . . a detention hearing is authorized only 'if one of the six [now seven] circumstances set forth in § 3142(f)(1)(A)–(D) and (f)(2)(A)–(B) are met.") (quoting *United States v. Hardon*, No. 98-1625, 1998 WL 320945, at *1 (6th Cir. June 4, 1998)).

The Court must therefore look first to the offense at issue. The Complaint charges Defendant with unlawful reentry under 8 U.S.C. § 1326(a):

(a) In general

Subject to subsection (b), any alien who--

(1)     has been denied admission, excluded, deported, or removed or has departed the United States while an order of exclusion, deportation, or removal is outstanding, and thereafter

(2)     enters, attempts to enter, or is at any time found in, the United States, unless (A) prior to his reembarkation at a place outside the United States or his application for admission from foreign contiguous territory, the Attorney General has expressly consented to such alien's reapplying for admission; or (B) with respect to an alien previously denied admission and removed, unless such alien shall establish that he was not required to obtain such advance consent under this chapter or any prior Act,

shall be fined under Title 18, or imprisoned not more than 2 years, or both.

Importantly for purposes of the Government's motion, this offense is not one that Congress specifically identified as *requiring* a detention hearing. *See* 18 U.S.C. § 3142(f)(1)(A)–(E). The Government therefore cannot merely cite the nature of the charged offense as a basis for a detention hearing, as is the case with those offenses listed in § 3142(f)(1). Instead, the Government relies exclusively on § 3142(f)(2)(A), which provides:

(f) Detention hearing.—The judicial officer shall hold a hearing to determine whether any condition or combination of conditions . . . will reasonably assure the

5

appearance of such person as required and the safety of any other person and the community—

***

(2) upon motion of the attorney for the Government or upon the judicial officer's own motion, in a case that involves—

(A) a **serious risk that such person will flee**[.]

18 U.S.C. § 3142(f)(2)(A) (emphasis added).

As discussed during the Hearing, ". . . when the Government seeks detention pursuant to a motion filed under Section 3142(f)(2)(A), the Court must find by a preponderance of the evidence that the case involves a serious risk of flight." *White*, 2021 WL 2155441, at *7. While conceptually similar, the "serious risk of flight" contemplated under § 3142(f)(2)(A) and the risk of non-appearance analyzed under § 3142(e) are in fact distinct. *Id.* at *8 ("But to say that there is a *relationship between* [the terms] is to say that there is a *distinction between* them. They are not the same thing.") (emphasis in original). Further, the parties agreed at the Hearing that the *White* court's definition of "flight" for purposes of analyzing § 3142(f)(2)(A) is appropriate: it is "*a risk that the defendant will intentionally avoid appearing in court as required*." *Id.* at *10 (emphasis in original); *see also United States v. Rodriguez-Fuentes*, No. 5:24-CR-00122-KKC-MAS, 2025 WL 711955, at *5 (E.D. Ky. Mar. 5, 2025) ("The core inquiry . . . is whether there is a serious risk a defendant will *voluntarily* evade judicial oversight.") (emphasis in original); [Doc. 8 at Page ID # 17] ("The United States does not quarrel with [*White's*] definition; it embraces it.").

Therefore, the Government is not entitled to a detention hearing under the Bail Reform Act unless it proves, by a preponderance of the evidence, that there is a serious risk that Defendant will intentionally avoid appearing in Court as required. "The preponderance of the evidence standard requires that the risk be substantial, rather than speculative or theoretical." *Rodriguez-Fuentes*, 2025 WL 711955, at *1.

6

### B.   Whether this Case Involves a "Serious Risk of Flight"

The Court must now analyze whether this case involves a "serious risk of flight," which is a fact-specific inquiry that does not lend itself to a rigid set of rules. Before turning to the proof with which the Government attempts to carry its burden, the Court addresses what appears to be the gravamen of the Government's position—that Defendant's prior unlawful reentries into the United States, standing alone, make him a "serious risk of flight" under the Bail Reform Act:

> A defendant who has been removed from the United States four times and returned each time has demonstrated—through years of volitional conduct—that no border, no court order, and no prior conviction will deter him from going wherever he chooses. That is not a risk of involuntary nonappearance; it is a serious risk of flight in its purest form.

[Doc. 8 at Page ID # 15]. This argument, while initially compelling, is a broad and sweeping statement that ignores both the plain language of the Bail Reform Act and the factual circumstances discussed in the authorities upon which the Government relies.

First, the Government's argument that the offense of unlawful reentry is "a serious risk of flight in its purest form" effectively rewrites the Bail Reform Act and would create a *per se* rule barring deportable aliens from pretrial release. Congress identified several specific types of cases—including, but not limited to, those involving a crime of violence, an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act, or possession of a firearm or destructive device—as facially sufficient to trigger a detention hearing. *See* 18 U.S.C. § 3142(f)(1)(A)–(E). Congress did not include cases involving unlawful reentry in that list. It is well settled that, "as a matter of statutory interpretation, the expression of one thing is the exclusion of another." *HRT Enterprises v. City of Detroit, Michigan*, 162 F.4th 810, 817 (6th Cir. 2025) (citing *NPF Franchising, LLC v. SY Dawgs, LLC*, 37 F.4th 369, 383 (6th Cir. 2022) (applying the canon of *expressio unius est exclusio alterius*)). The Court respectfully

7

declines to interpret the Bail Reform Act in a manner that would substitute the Court's judgment for that of Congress.[5]

Second, the cases upon which the Government relies are all distinguishable and, if anything, bolster the notion that a "serious risk of flight" requires a showing of something *more than* the nature of the crime. Indeed, at least one of the cases cited by the Government makes clear that an alleged unlawful reentrant's ability and incentives to flee (*i.e.*, avoiding the almost certain result of deportation) "are not so great as to support, by themselves, the conclusion that this case 'involves . . . a serious risk that [the defendant] will flee.'" *United States v. Reymundo*, 792 F. Supp. 3d 612, 625 (D. Md. 2025). The Court must instead look past the mere offense and conduct a thorough analysis of other relevant factors.

Take, for example, *United States v. Aleman-Duarte*, No. 3:19-CR-149-PLR-DCP, 2020 WL 236870 (E.D. Tenn. Jan. 15, 2020), in which the court held defendant was a serious flight risk. That finding was based on a litany of concerns *in addition to* defendant's prior unlawful reentries, including that the defendant had "used the alias 'Ricardo Lopez-Aleman'" in the past, had "minimal ties" to the district and "limited ties to this community[,]" "has no known financial resources, is not employed, and is unlikely to get a job, due to this status as an illegal alien[,]" and "his most recent criminal conviction was for the aggravated kidnapping and sexual battery of a coworker at the hotel where he and the victim were employed." *Id.* at * 5. Similarly, in *Reymundo*, the court based its decision on evidence that defendant (1) "demonstrated on several occasions a long-standing capacity to travel significant distances, crossing several national and state borders

---

[5] During the Hearing, the Government argued that Defendant's crime is "different" because it is continuing in nature (*i.e.*, Defendant's continued presence alone violates federal law). The Court does not necessarily disagree. But, again, Congress has expressly identified those offenses it considers sufficiently "different" enough to require a detention hearing. This is not one of those crimes.

each time[;]" (2) "lacks ties to the local community, [with] no indication that he has connections to any particular community in this country[;]" and (3) "has presented no employment record and no record of fulfilling family or community responsibilities to weigh against finding that he cannot be trusted or relied upon to conform his behavior to the requirements of a release order." 792 F. Supp. 3d at 624–26. Finally, in *Rodriguez-Fuentes*, the defendant: (1) had pending state court charges for "kidnapping, unauthorized use of a motor vehicle, and fourth-degree assault all stemming from a domestic violence incident with his current partner[;]" (2) "faces a maximum 20-year federal sentence for illegal reentry after an aggravated felony conviction[;]" (3) had family still living in Mexico; (4) told the government "he fears returning to Mexico due to cartel violence and safety concerns" thereby evidencing another incentive to avoid court; and (5) "[r]ather than respect the deportation orders of this country, Rodriguez-Fuentes illegally re-entered the United States and incurred new state charges for violent crimes." 2025 WL 711955, at *5–6.

These cases[6] all support the unremarkable proposition that the Government must provide something more than a history of unlawful reentries to carry its burden under 18 U.S.C. § 3142(f)(2)(A). Although the Sixth Circuit has not adopted any rigid test, the parties agreed at the Hearing that application of the following factors would be appropriate for the Court's consideration: (1) the incentive to flee; (2) the ability to flee; (3) ties to the jurisdiction and the United States; and (4) reliability and trustworthiness. *Rodriguez-Fuentes*, 2025 WL 711955, at *3

---

[6] The Government also cites *United States v. Cobix-Espinoza*, 655 F. Supp. 3d 584 (E.D. Ky. 2023). There, however, the defendant conceded that the government satisfied its evidentiary burden. *Id.*, at 589 ("In support of its motion under § 3142(f)(2)(A), the United States proffered that Cobix-Espinosa is subject to an ICE administrative detainer. Cobix-Espinosa conceded that the United States had produced preponderant evidence that he was a serious risk of flight. So, the Court will look no further.").

(citing *United States v. Figueroa-Alvarez*, 681 F. Supp. 3d 1131, 1140 (D. Idaho 2023)). The Court analyzes those factors here.

### 1. Defendant's Incentive to Flee

The Government argues that Defendant has every incentive to flee because he faces almost certain deportation. In support of this argument, the Government cites *Reymundo*, in which the court "order[ed] detention of [an] illegal reentry defendant removed four times who had 'clear incentive to flee prosecution to avoid a sentence of imprisonment and his fifth deportation.'" [Doc. 8 at Page ID # 15]. As noted above, however, even the *Reymundo* court noted that an alleged unlawful reentrant's ability and incentives to flee (*i.e.*, avoiding the almost certain result of deportation) "are not so great as to support, by themselves, the conclusion that this case 'involves . . . a serious risk that [the defendant] will flee.'" *Reymundo*, 792 F. Supp. 3d at 625. Indeed, if the incentive to avoid deportation were enough to carry the day, then *every* case involving an alleged violation of 8 U.S.C. § 1326 would involve a "serious risk of flight." That is not the law.

Further, the evidence at this admittedly early stage of the proceeding reflects that Defendant has every incentive *not* to flee. He is married to a United States citizen. He resides in a community to which he, for nearly three decades, has consistently returned. He has a young daughter (also a United States citizen) in a permanent vegetative state, who requires around-the-clock care provided by his wife. And, as a result, he is the only person in the household able to provide financially for his family's needs. To intentionally evade the Court would be tantamount to intentionally abandoning his family, something Defendant's numerous reentries to the United States indicate he has no desire to do. This factor therefore weighs against finding that Defendant is a serious flight risk.

10

### 2. *Defendant's Ability to Flee*

The Government offers no evidence whatsoever of Defendant's ability to flee. The Court is unaware of any significant financial assets or other resources that would create such an ability. Rather, Defendant contends that "[e]very dime that Mr. Andrade has or makes goes to the care of his daughter and keeping a roof over his family's head." [Doc. 11 at Page ID # 28]. This factor therefore also weighs against a finding that Defendant is a serious flight risk.

### 3. *Defendant's Ties to the Jurisdiction and the United States*

The Government argues that Defendant "has limited ties to the community[,]" as evidenced by a "criminal history dat[ing back] to 1997 and span[ning] Georgia, Tennessee, and Texas." [Doc. 8 at Page ID # 19]. During the Hearing, the Government asserted that these facts reflected a "transient" Defendant. The Court finds that assertion unsupported by the record, when, taken together with Defendant's proffer, reflects that Defendant's presence in the Northern District of Georgia has been interrupted only by his removals from and attempts to reenter the United States. As noted above, Defendant has a home in the Northern District of Georgia, where he lives with his wife and provides financial support for his disabled daughter. Although Defendant has no apparent ties to the Eastern District of Tennessee, that fact does not alter the analysis, especially in light of the United States Probation Office's resources to monitor him in the neighboring Northern District of Georgia. *See, e.g.*, *White*, 2021 WL 2155441, at *14 ("The fact that Defendant lacks community ties specifically to this district may be probative of his risk of unintentional non-appearance in this district, but it is not very probative of whether he would intentionally not show up here and instead choose the path of a fugitive.")). Again, this factor weighs against finding that Defendant is a serious flight risk.

11

### 4. Defendant's reliability and trustworthiness

The Government again here focuses much of its argument on Defendant's clearly documented pattern of ignoring removal orders. Defendant's counsel argues that these reentries are nonviolent crimes that simply reflect Defendant's desire to be in this country. While that may be true, Defendant's conduct evidences a complete disregard for the laws of the United States of America. The Court cannot ignore that fact, which is pertinent to Defendant's reliability and trustworthiness.

But the Court also notes that this same argument applies to *any* criminal defendant who is not a first-time offender. Take, for example, the crime of wire fraud, which the Government raised during the Hearing. Suppose John Smith is convicted of wire fraud and ordered to pay restitution to the victims of the offense. He fails to do so. Upon his release, he defrauds a new group of victims and is again convicted and ordered to pay restitution. Again, Mr. Smith fails to do so. Is Mr. Smith a repeat offender? Absolutely. Has he demonstrated a pattern of willfully violating the law and ignoring court orders? Undoubtedly. But does his noncompliance, standing alone, demonstrate that he is a risk of flight? To answer in the affirmative would be to find that all repeat offenders are, as a matter of law, a "serious risk of flight." The Court is not inclined, under these specific facts, to weigh a disregard for 8 U.S.C. § 1326 any more or less heavily than a disregard for any *other* provision of the United States Code. And to the extent prior offenses are pertinent to the "serious risk of flight" analysis, the Court notes that none of Defendant's prior convictions involve absconding or fleeing the jurisdiction. If anything, Defendant has demonstrated over the course of several decades his intent to return to the Northern District of Georgia.

That said, the record creates other concerns about Defendant's reliability and trustworthiness. The PTSR reflects that between July 1997 and June 2011, Defendant was arrested several times and convicted for DUI, driving without a license, and possession of

12

methamphetamine. During the next almost 15 years—from June 2011 to March 2026—Defendant's only arrests were in connection with his four removals from the United States. Finally, on March 8, 2026, Defendant was arrested for and pleaded guilty to possession of drug paraphernalia. Although the State dismissed the criminal impersonation charge stemming from the arrest, Defendant's counsel conceded that Defendant provided a fake name to the officer when prompted. Defendant's misrepresentation to law enforcement in connection with his most recent arrest raises concerns about his reliability and trustworthiness.

Finally, the Court addresses the parties' disagreement regarding the significance of the absence from the PTSR of any citations for failure to appear in prior proceedings. Defendant argues that the absence of such citations demonstrates "he has clearly made himself available to the Court for prosecution." [Doc. 11 at Page ID # 29]. The Government argues the only reason Defendant has never failed to appear is because he has "never had lawful status, never had a pending case in which conditions could be set, and never stayed long enough for the system to impose them." [Doc. 8 at Page ID # 15]. The Court finds that the information available at this early stage of the proceedings indicates only that Defendant has never been cited for a failure to appear. And the Government has not offered any evidence showing whether Defendant was released on bond or remained in custody during the pendency of any prior cases. Given the limited information available to the Court at this time, this point is, at best, a wash.

Overall, this factor weighs slightly in favor of finding Defendant is a serious flight risk. But it is not enough to satisfy the Government's burden when considered alongside the other factors discussed herein.

13

## III. CONCLUSION

For the reasons set forth herein, the Court finds the Government has failed to carry its burden of proving, by a preponderance of the evidence, that there is a serious risk that Defendant will intentionally avoid appearing in Court as required. The Court therefore respectfully **DENIES** the Government's motion [Doc. 8]. The detention hearing currently set for April 3, 2026, is **CANCELED**. Defendant shall remain in custody pending further order of the Court addressing the conditions of release.

SO ORDERED.

ENTER:

/s/ _____
MIKE DUMITRU
UNITED STATES MAGISTRATE JUDGE

14